1
2
3
4
5
6
7
8

**UNITED STATES DISTRICT COURT**

9

**EASTERN DISTRICT OF CALIFORNIA**

10

| | |
|---|---|
| 11  UNITED STATES OF AMERICA, | Case No. 1:22-cr-00062 JLT SKO |
| 12            Plaintiff, | REDACTED ORDER RE MOTIONS IN LIMINE AND OTHER PRETRIAL |
| 13       v. | MATTERS |
| 14  ALMA GARZA, | (Docs. 530, 531, 532, 533, 534, 535, 536, 539, 540, 545, 541, 542, 563) |
| 15            Defendant. | |
| 16 | |

17      Trial in this matter is set for September 24, 2024. Pending are numerous motions *in limine*

18  and related motions. The Court held a hearing on the motions on September 16, 2024. Antonio

19  Pataca and Justin Gilio appeared for the United States; W. Scott Quinlan appeared for Defendant.

20  Having considered the entire record, the Court rules as follows.

21                    **I.       BACKGROUND**

22      The Government provides the following overview of the investigation that led to the

23  charges at issue in this case.

24          In October of 2021, members of the investigative team identified a
    fentanyl-pill supplier in Fresno, CA named Uriel Diaz-Santos. After

25      executing a search warrant at Diaz-Santos's residence and
    searching his phone, investigators identified Horacio Torrecillas-

26      Urias Jr., [(aka "JR")] as Diaz-Santos's supplier. Investigators then
    used various investigative techniques, including federal

27      authorization to intercept [JR's] telephone and text message
    conversations and obtained evidence that [JR] conspired with

28      others—suppliers in Mexico, assistants in Fresno County (including

the defendant), and resellers in Fresno County and New Mexico—
to possess with intent to distribute and to distribute fentanyl,
methamphetamine, and cocaine.

(Doc. 542 at 10.) The facts most pertinent to Ms. Garza are set forth below.

In December 2021 and January 2022, banking records and photographs on the phone of a known drug trafficker, Horacio Torrecillas Urias, Jr. (known as "JR"), indicate that Ms. Garza made transfers of amounts between $900 and $1000 to different recipients in Culiacan, in Sinaloa, Mexico. (Doc. 542 at 10–11 (citing GARZA 2542, 2704).)

Around noon on January 27, 2022—a Thursday—officers intercepted a telephone call between JR and Ms. Garza, in which JR asked Ms. Garza to mail a package for him. (Doc. 188 at 15.) Initially, Garza protested, and questioned why the person who was paid to do this work could not do it. (*Id.*) Even still, Garza travelled to the post office and deposited the package in the mail. (*Id.*) During the visit to the post office, at about 2:30 p.m., Garza spoke by telephone with JR. (*Id.*) She told him that the package could not be delivered by the next day, but it could be delivered by Saturday. (*Id.*) She verified that she should send the package in this manner, despite the $75 cost. (*Id.* at 16.) JR agreed, and Garza paid the money and posted the package to be delivered to 1000 La Fonda Drive, Apartment H, Las Cruces, New Mexico. (*Id.*)

Later that night, at 9:18 p.m., JR spoke to the recipient of the package and informed him, "I sent you that shit already," and told him that he would have to sign for the package when it was delivered because Garza had accidentally included the signature requirement when she mailed it. (Doc. 188 at 16.) The recipient told JR that he was opening a bank account and would send JR a debit card, so JR could withdraw the money, which would constitute payment. (*Id.*)

The next afternoon, on Friday, January 28, 2022, at 4:02 p.m., JR called Garza and asked her to "check the tracking on the shit." (Doc. 188 at 17.) Garza responded, "check what?" (*Id.*) JR replied, "the tracking on the shit we sent." Garza agreed to do so, but then she forgot to do it. A little while later, at 4:33 p.m. the recipient of the package texted JR and asked when the package would arrive. (*Id.*) JR informed him that it would arrive either that same day or the day after. (*Id.*) JR said he'd check the tracking info and get back to him. (*Id.*) At 7 p.m., JR contacted Garza and again asked her to check the tracking information because "they were asking." (*Id.*)

2

1    Garza reported that she had forgotten to do it earlier because she was busy. (*Id.*) Garza

2    confirmed the package would arrive the next day, Saturday. (*Id.*) At 7:50 p.m., JR reported to the

3    recipient that the package would arrive on Saturday, which was January 29, 2022. (*Id.*)

4    During this time on January 27, 2022, agents confirmed that the package was sent from

5    the Hughes Avenue post office, located in Fresno, that it weighed five pounds, three ounces and

6    that it was due to be delivered to an address in El Paso, Texas on January 29, 2022. (Doc. 188 at

7    17.) On Friday, January 28, 2022, at the request of investigating officer, HIS Special Agent

8    Andres Varela, Postal Inspectors in El Paso re-routed the package back to Fresno, and it was

9    scheduled to arrive, and did arrive, on January 29, 2002. (*Id.* at 17, 27.)

10   Pursuant to a search warrant, agents opened the package on January 30, 2022. (Doc. 207-

11   1.) It was labeled with a sender's name that was not Ms. Garza's and was found to contain

12   methamphetamine and cocaine. (Doc. 188 at 27.)

13   A few weeks later, on February 9, 2022, JR and Defendant traveled from Fresno to Sanger

14   in two separate cars. (Doc. 539-1 at 94–95.) Before the trip, JR communicated to Gladitza

15   Vasquez (his girlfriend and coconspirator) that he needed "Alma to go do something for me.

16   Well, I need her to go behind me or me behind her to go do something." (Doc. 539-1 at 94–95.)

17   Intercepted calls evidenced that this trip was to drop off the "bad ones" that Juan Valencia Jr. was

18   storing for JR. (*Id.*) Surveillance observed one car driven by JR and another driven by Garza

19   depart together, travel to Valencia's residence, and then travel to Sanger, in tandem. (Doc. 541 at

20   10.) Shortly after they arrived at a residence in Sanger, the defendant departed. (*Id.*) Moments

21   later, JR and Valencia Jr. delivered a bag to an individual (Abel Lozano) who took the bag into

22   the Sanger residence. (*Id.*) During the execution of a search warrant at that residence two days

23   later (Feb. 11), agents found a bag consistent with this one inside the garage. (*Id.*) From Lozano's

24   garage, agents seized about 7,000 blue and green M/30 suspected fentanyl pills. (*Id.*)

25   Between the delivery and the search, on February 10, 2022, JR was intercepted on his

26   phone discussing the delivery with the recipient, Abel Lozano. (*Id.*) During the call, the two

27   discussed that there was a total of "6,630" of "the green ones" and "7" of the "dark ones, the blue

28   ones." (*Id.*) This was corroborated by the residential search. (*Id.*) Officers found about 6,250 blue

3

and green pills laced with fentanyl and methamphetamine. (*Id.*) When they searched the Sanger residence, officers seized Abel Lozano's phone. (*Id.*) The phone contained messages between Lozano and another individual (Isidro Zuriel Cruz Vizcarra). (*Id.* at 10–11.) Those messages evidenced that Cruz Vizcarra served as an intermediary between Lozano and JR. (*Id.* at 11.) Specifically, the two discussed the product that JR could offer and JR's arrival for the delivery. (*Id.*)

On February 14, 2022, intercepted communications between JR and Alejandro Guzman (Defendant's brother) evidenced that Guzman would be traveling south for JR. (*Id.*) JR and Brayan Cruz were then intercepted discussing the quality of the pills that were going to arrive and the fact that the resupply was going to include methamphetamine. (*Id.*) Guzman was then surveilled traveling south to a parking lot in Riverside CA, obtaining a white bag from a person there in the parking lot, and then driving back toward Fresno. (*Id.*) Guzman and JR communicated about the trip along the way. (*Id.*) The investigative team coordinated a traffic stop on Guzman in Kern County. (*Id.*) A search of the vehicle resulted in the seizure of approximately 1.56 kg of M/30 fentanyl pills (approximately 15,000 pills) and 4.75 pounds of crystal methamphetamine. (*Id.*)

That same night, when Guzman stopped responding to JR's messages, JR began to suspect that Guzman had been arrested. (Doc. 539-1 at 108–14.) He called Garza and the two discussed the "errand" JR had sent Guzman on and the ramifications of the fact that Guzman was now not answering. (*Id.*) JR also spoke with Justin Riddle about the same issue and the two discussed that some of the drugs Guzman was transporting were intended for Riddle. (Doc. 541 at 11.) Around the same time, JR and Garza continued to discuss their failed attempts to reach Guzman by phone and eventually talked about efforts to bail him out of custody. (Doc. 539-1 at 108–14.) The next day, Garza informed JR that she would be picking up Guzman from jail, and she agreed to get information about the circumstances of the traffic stop from Guzman to relay to JR. (Doc. 541 at 11–12.)

The defendant was interviewed by law enforcement officers on March 31, 2022. (Doc. 541 at 4.) During her interview, Garza admitted knowledge about (1) how JR would obtain his

1    supply of drugs, (2) who supplied him, (3) where he stored his drugs and money, and (4) who

2    helped him sell drugs. (*Id.* at 4–5.) She also admitted to assisting JR by (1) having passed phone

3    numbers on to him that were given to her by his drug supplier, (2) mailing the above-described

4    parcel for him, and (3) traveling to at least one other drug transaction with him. (*Id.* at 6.)

5        Garza is charged in Count 1 with conspiring to distribute and possessing with intent to

6    distribute cocaine, methamphetamine, and fentanyl in the County of Fresno and elsewhere

7    between on or about November 2, 2021 and March 31, 2022. (Doc. 509.) Garza is also charged in

8    Count 2 with possession with intent to distribute cocaine and methamphetamine on or about

9    January 27, 2022[1]. (*Id.*)

## II. MOTIONS IN LIMINE

**A.**    <u>Legal Standards</u>

### 1. Motions in Limine Generally

13        "A motion in limine is a procedural mechanism to limit in advance testimony or evidence

14    in a particular area." *United States v. Heller*, 551 F.3d 1108, 1111 (9th Cir. 2009) (citation

15    omitted). "Although the Federal Rules of Evidence do not explicitly authorize *in limine* rulings,

16    the practice has developed pursuant to the district court's inherent authority to manage the course

17    of trials." *Luce v. United States*, 469 U.S. 38, 41 n.4 (1984) (citations omitted). "[A] ruling on a

18    motion *in limine* is essentially a preliminary opinion that falls entirely within the discretion of the

19    district court." *City of Pomona v. SQM N. Am. Corp.*, 866 F.3d 1060, 1070 (9th Cir. 2017)

20    (internal quotation marks and citation omitted). Importantly, "[t]he movant has the burden of

21    establishing that the evidence is not admissible for any purpose." *United States v. Wager*, 651 F.

22    Supp. 3d 594, 598 (N.D.N.Y. 2023) (citation omitted).

### 2. Federal Rules of Evidence 401/403

24        Evidence is relevant if "(a) it has any tendency to make a fact more or less probable than it

25    would be without the evidence; and (b) the fact is of consequence in determining the action." Fed.

26    R. Evid. 401. Even relevant evidence may be excluded "if its probative value is substantially

---

[1] Count 3, which charged Defendant with distribution of a mixture containing methamphetamine and fentanyl, has been dismissed. (Doc. 553.)

1  outweighed by a danger of one or more of the following: unfair prejudice, confusing the issues,

2  misleading the jury, undue delay, wasting time, or needlessly presenting cumulative evidence."

3  Fed. R. Evid. 403. In evaluating these Rule 403 considerations, district courts enjoy "wide

4  latitude" to admit evidence. *Hemmings v. Tidyman's Inc.*, 285 F.3d 1174, 1184 (9th Cir. 2002). A

5  court may not use Rule 403 to exclude evidence "on the ground that it does not find the evidence

6  to be credible." *See United States v. Evans*, 728 F.3d 953, 963 (9th Cir. 2013) ("Weighing

7  probative value against unfair prejudice under Rule 403 means probative value with respect to a

8  material fact if the evidence is believed, not the degree the court finds it believable."). That is, "a

9  conflict in the evidence goes to the weight of [the evidence], not to its admissibility." *United*

10  *States v. Candoli*, 870 F.2d 496, 509 (9th Cir. 1989).

11  **III.    DISCUSSION**

12  **A.    Expert and Lay Opinion Issues**

13     **1.    Government's Motion to Preclude Testimony of Defense Expert Rosa Toro**

14         **(Doc. 542 at 29–32)**

15     The Government moved to preclude testimony from a disclosed Defense expert witness,

16  Dr. Rosa Toro. (Doc. 542 at 29–32.) On September 6, 2024, Defendant withdrew Dr. Toro as a

17  trial witness. (Doc. 558.) This motion is therefore **DENIED AS MOOT**.

18     **2.    Defendant's Motion in Limine #2 to Require Foundation for Expert and Lay**

19         **Opinion Testimony Re Agent Riley (Doc. 531).**

20     Defendant requests that the Government be ordered to lay the foundation for any expert or

21  lay testimony it seeks to elicit. (Doc. 531 at 2.) As the Government indicates (Doc. 569 at 2), this

22  objection is premature. As appropriate, Defendant may raise foundation objections at trial.

23     **3.    Defendant's Motion in Limine #3 for *Daubert* Findings on Each Government**

24         **Expert (Doc. 532); Government's Cross-Motion to Admit Expert Testimony**

25         **(Doc. 542 at 14–20); Defendant's Specific Objections to Agent Riley's Planned**

26         **Testimony (Docs. 531, 589)**

27     Defendant requests that the Court determine the qualifications of each expert offered by

28  the Government and the relevance and reliability of the expert's methods and conclusions

6

1   pursuant to *Daubert v. Merrell Dow Pharmaceuticals, Inc.* 509 U.S. 579 (1993). (Doc. 532.) The

2   Government has cross-moved for admission of testimony from its experts. (Doc. 542 at 14–20.)

3              a.   *Daubert Standard*

4         Under Federal Rule of Evidence 702, "[a] witness who is qualified as an expert by

5   knowledge, skill, experience, training, or education may testify thereto in the form of an opinion

6   or otherwise." Such expert testimony is permissible if:

7             (a) the expert's scientific, technical, or other specialized knowledge will help the

8             trier of fact to understand the evidence or to determine a fact in issue;

9             (b) the testimony is based on sufficient facts or data;

10            (c) the testimony is the product of reliable principles and methods; and

11            (d) the expert has reliably applied the principles and methods to the facts of the

12            case.

13  *Id.* "Faced with a proffer of expert scientific testimony . . . the trial judge must determine at the

14  outset . . . whether the expert is proposing to testify to (1) scientific knowledge that (2) will assist

15  the trier of fact to understand or determine a fact in issue. This entails a preliminary assessment of

16  whether the reasoning or methodology underlying the testimony is scientifically valid and of

17  whether that reasoning or methodology properly can be applied to the facts in issue." *Daubert*,

18  509 U.S. at 592. From a practical perspective, the analysis normally follows three steps.

19          [First,] [t]he trial court must decide whether the witness called is
    properly qualified to give the testimony sought. A witness may be
20          qualified as an expert on the basis of either knowledge, skill,
    experience, training, or education or a combination thereof, Rule
21          702. The trial court must further determine that the testimony of the
    expert witness, in the form of an opinion or otherwise, will assist
22          the trier of fact, i.e., be helpful, to understand the evidence or to
    determine a fact in issue, Rule 702(a). Finally the trial court must
23          determine that as actually applied in the matter at hand, Rule
    702(d), to facts, data, or opinions sufficiently established to exist,
24          Rule 702(b), including facts, data, or opinions reasonably relied
    upon under Rule 703, sufficient assurances of trustworthiness are
25          present that the expert witness' explanative theory produced a
    correct result to warrant jury acceptance, i.e., a product of reliable
26          principles and methods, Rule 702(c).

27  *Berman v. Freedom Fin. Network, LLC*, 400 F. Supp. 3d 964, 971 (N.D. Cal. 2019) (quoting

28  Michael H. Graham, 5 HANDBOOK OF FED. EVID. § 702:1 (7th ed.) (footnotes omitted)). The

Supreme Court has provided a non-exclusive list of factors that weigh into a trial court's reliability determination, including: (i) whether the method has been tested; (ii) whether the method has been published and subject to peer review; (iii) the error rate; (iv) the existence of standards and whether the witness applied them in the present case; and (v) whether the witness's method is generally accepted as reliable in the relevant medical and scientific community. *Daubert*, 509 U.S. at 593–94. The burden of establishing, by a preponderance of the evidence, that Rule 702's admissibility requirements have been met falls on the proponent of the testimony. *See Southland Sod Farms v. Stover Seed Co*., 108 F.3d 1134, 1141 (9th Cir. 1997).

Before admitting expert testimony into evidence, the district court must perform its gatekeeping role by making an explicit finding of reliability. *United States v. Ruvalcaba-Garcia*, 923 F.3d 1183, 1188–90 (9th Cir. 2019) (internal quotation marks and citation omitted). In so doing, the Court must find both that (1) the witness is qualified in the tendered area(s), and (2) that, based on the methodologies employed, the witness has a "reliable basis in the knowledge and experience of the relevant discipline" to offer opinions in the tendered area(s). *Id*. at 1190.

b. *Expert Witnesses Not Directly Challenged by Defendant*

Defendant has not specifically challenged the reliability of the following Government experts[2] and has not requested a pretrial hearing as to those witnesses.

- Steven L. Aliyetti – forensic chemistry
- Kelsey M. Roberts – forensic chemistry
- Michael Tumbiolo – digital forensic examination
- Special Agent Andres Varela – digital forensic examination
- Ulises Solorio – digital forensic examination

i.   Steven L. Aliyetti, Forensic Chemist

Mr. Aliyetti is a supervisory forensic chemist with the Drug Enforcement Administration, with training and expertise regarding forensic chemistry for controlled substance analysis. (Doc. 570-1 at 13.) Mr. Aliyetti conducted forensic chemical analyses for certain exhibits at issue in this case, ultimately determining that it contained Fentanyl, methamphetamine, and acetaminophen.

---

[2]  The Government withdrew Earl W. Hewett as an expert at the hearing on the motions in limine.

(*Id.*) The Government indicates that Mr. Aliyetti will testify about the process he followed in conducting these forensic chemical analyses, the results of his analyses, and his opinions about the substance identified for the item he tested. (*Id.*) According to the amended expert disclosure:

> Mr. Aliyetti's opinions to which he will testify are based on the chemical, physical, and instrumental analyses, the results generated by those analyses, and his interpretation of those results set forth in the laboratory report and analyst notes. The manner and process by which he performed the analyses were, to the best of his knowledge, in accordance with the publicly available Analysis of Drugs Manual (ADM) and Laboratory Operations Manual (LOM), in effect at the time of analysis. These are generally available [on the internet]. He analyzed the material contained in the exhibit(s) which were submitted for analysis []. The analytical methods used in these analyses are validated and verified according to DEA's quality assurance policy to ensure the methods are reliable and fit-forpurpose and the techniques utilized are widely accepted and employed in the scientific and forensic community. Summaries of instrumental methods are available [online].

(*Id.*) Further, Mr. Aliyetti's *curriculum vitae* reveals that he obtained bachelor's degrees in forensic science and general chemistry in 2011 and completed some master's coursework in Forensic Science in 2016-17. (Doc. 581-1.) He has worked in forensic chemistry for the Drug Enforcement Administration since 2017 and has completed relevant training in that field. (*Id.*) The Court finds that Mr. Aliyetti is qualified in forensic chemistry and that he employed reliable methods from that discipline to offer opinions in the areas mentioned above.

ii.    Kelsey M. Roberts.

Ms. Roberts is a senior forensic chemist with the Drug Enforcement Administration. She has extensive relevant education, training, and experience regarding forensic chemistry for controlled substance analysis. (*See* Doc. 595-2.) Ms. Roberts conducted forensic chemical analyses of evidence in this case. She determined that (1) Exhibit 9.01 contains Fentanyl, methamphetamine, and acetaminophen, and (2) Exhibit 9.02 Fentanyl, methamphetamine, and acetaminophen. The Government anticipates that Ms. Roberts will testify about the process she followed in conducting these forensic chemical analyses, the results of her analyses, and her opinions about the substance(s) identified for the items she tested. (Doc. 542 at 15–16.) The government produced her report to the defense during discovery. The Court finds that Ms. Roberts is qualified in forensic chemistry and may testify as to the analyses she conducted,

1    assuming an adequate foundation is shown.

2                    iii.      Michael Tumbiolo, Digital Forensic Examiner

3           Michael Tumbiolo is a Digital Forensic Examiner with the Homeland Security

4    Investigations. (Doc. 57-1 at 11.) The Government's amended expert notice indicates that Mr.

5    Tumbiolo preformed the following tasks:

6               Mr. Tumbiolo conducted extractions of the following cellular
                phones identified at Torrecillas_1861-1905: red Apple iPhone, blue
7               Nokia cell phone, and black TCL cell phone. Mr. Tumbiolo also
                conducted an extraction of the iPhone referenced at Torrecillas-
8               00017355-17362.

9    (Doc. 570-1 at 11.) The Government anticipates Mr. Tumbiolo will testify about

10              [T]he software and methods he used to extract data from these
                cellular phones. Specifically, Mr. Tumbiolo will testify about how
11              and why data contained in reports of cellular phone extractions is
                identical to data on the cellular phones themselves at the time the
12              extractions take place. Mr. Tumbiolo may also testify about what
                various items of electronic evidence in the extraction reports he
13              generated indicate, including when these items were created, and
                how they were saved on the cellular phones. Mr. Tumbiolo may
14              also testify about the meaning of specific terms in the extraction
                reports, including that a phone number associated with a "user
15              account" for a phone indicates that the listed phone number was
                used by the phone. Mr. Tumbiolo will also testify about why some
16              data on a cell phone may not be captured in an extraction.

17
     (Id. at 11–12.) The Court has also examined Mr. Tumbiolo's curriculum vitae, which details his
18
     Information Systems degrees obtained in 2000 and 2011 and specialized training and experience
19
     in digital forensics from 2012 to 2023. (Doc. 585-2.)
20
            The Court finds that Mr. Tumbiolo is qualified in digital forensics and that he employed
21
     reliable methods from that discipline to offer opinions in the areas mentioned above.
22
                    iv.      Special Agent Varela
23
            Andres Varela is a Special Agent with the Homeland Security Investigations. He has
24
     extensive training and experience in complex investigations and specific training in mobile device
25
     examination. (Doc. 595-1.) He has been trained in using Celebrite, which required him to pass a
26
     written examination, and has completed more than 50 extractions on mobile devices. Id. at 2. SA
27
     Varela conducted extractions of certain cellular phones in this case. The Government anticipates
28

                                                   10

that Agent Varela will testify about his training and experience in conducting forensic examinations and extractions of electronic devices such as cellular phones; the software and methods he used to extract data from the cellular phone; and about how and why data contained in reports of cellular phone extractions is identical to data on the cellular phones themselves at the time the extractions take place. (Doc. 542 at 18.) Agent Varela is also anticipated to testify about the results of the extraction reports he generated in this case, what those reports indicate, when the various items were created, and how they were saved on the cellular phones. (*Id.*) He will also explain the meaning of specific terms in the extraction reports and why some data may not be captured in an extraction. (*Id.*)

The Court's tentative finding is that Agent Varela is qualified in the field of digital forensics such that he can offer opinions in this area. The Court's order is contingent upon his testimony that he employed reliable methods, which are widely accepted in the field, for conducting the extractions at issue in this case.

v.    Ulises Solorio

Ulises Solorio is a Digital Forensic Examiner with the Homeland Security Investigations. He has training and experience in conducting such data extractions from mobile devices. He conducted the extraction of a mobile device used by Defendant's brother. He will testify about the software and methods he used to do so and may testify about other aspects of mobile device extractions.

Though recognizing that testimony about information extracted from a mobile device may fall within lay witness testimony if it does not require specialized knowledge (*United States v. Jimenez-Chaidez*, 96 F.4th 1257, 1267 (9th Cir. 2024)), the Court's tentative finding is that Mr. Solorio is qualified in the field of digital forensics examinations such that he can offer opinions in this area. The Court's order is contingent upon his testimony that he employed reliable methods, which are widely accepted in the field, for conducting the extractions at issue in this case.

c.    *Special Agent Shawn Riley*

Defendant has challenged the reliability of Agent Riley's testimony, so the United States requested a pretrial *Daubert*. (Doc. 570 at 3.)

i.       Summary of qualifications and proposed testimony.

The Government provides the following summary of Agent Riley's qualifications:

> Shawn Riley is a DEA Special Agent assigned to the DEA District Office in Fresno, CA. He has been a DEA Special Agent since 2004. He has received specialized training in drug trafficking investigations, including drug interdiction, detection, and identification, and money laundering techniques and schemes. He graduated from the DEA Basic Agents Academy at the DEA Academy at Quantico, Virginia. In total he has received over 870 hours of comprehensive formalized classroom instruction in the areas outlined above. SA Riley has also been the lead or co-case agent for over 140 drug trafficking investigations, including complex regional and international drug trafficking organizations involved in manufacturing and distributing large quantities of controlled substances. The controlled substances involved in these investigations have included methamphetamine, heroin, cocaine and crack cocaine, fentanyl, MDMA, LSD, marijuana, and counterfeit pills containing fentanyl, methamphetamine, and other controlled substances. SA Riley has participated in the execution of hundreds of premises search warrants, debriefed hundreds of informants, cooperating individuals, and defendants, participated in over a dozen wiretap investigations, and conducted over a hundred controlled buys or buy/bust operations, and directed and supervised confidential sources. SA Riley has participated in hundreds of surveillance operations in support of drug trafficking investigations. He has also listened to hundreds of hours of lawfully intercepted telephone calls and test messages in support of drug trafficking organizations.

> In the last four years, SA Riley has not testified at trial as an expert or witness.

(Doc. 570-1 at 1–2.)

The Government plans to have Agent Riley testify as to the following topics and opinions:

> The structure of drug trafficking organizations and how they typically operate; the street value of narcotics; how drug traffickers use coded language and slang to avoid law enforcement detection; how drug traffickers engage in countersurveillance; why drug traffickers typically possess and use multiple cellular phones; the use of multiple individuals to transport, ship, store, and distribute narcotics and drug proceeds; how drug traffickers transfer money; the typical movement of narcotics from Mexico to Los Angeles and into the Central Valley; the use of encrypted applications; the use of brokers in conducting drug transactions; typical drug related communications regarding produce quality, strength, and cost; the purpose co-conspirators update each other about law enforcement presence, drug seizures, and arrests; and that drug traffickers generally do not entrust large quantities of drugs to people who are unaware they are transporting or distributing them.

(Doc. 542 at 11.) The amended expert disclosure provides specifics as to the expected opinions

1  Agent Riley will offer. (Doc. 563-1 at 5-8.)

2            i.          Defense Objections Re Agent Riley

3         Defendant moves for an order requiring the government to "identify each and every

4  opinion that its experts intend to offer pursuant to Federal Rules of Criminal Procedure Rule

5  16(a)(1)(G), and the bases and reasons for them." (Doc. 531) This motion is **DENIED**

6  **WITHOUT PREJUDICE** as insufficiently specific except as to Special Agent Shawn Riley.

7         As to Agent Riley, the Government provided an initial expert witness notice to the

8  Defense on August 26, 2024, which listed 30 topics and opinions the Government planned to

9  cover during Agent Riley's testimony. (Doc. 531-1.) On September 6, 2024, the Government

10  provided the Defense with an amended expert witness notice for Agent Riley. (Doc. 570-1 at 1–

11  10.)

12         Defendant also requests that the Government be ordered to "identify which of the 30

13  [listed] subjects Agent Riley is to address as an expert witness, and the bases for his opinion."

14  (Doc. 531 at 2.) The Government is required to provide, in writing, a disclosure "for any

15  testimony that the government intends to use at trial under Federal Rule of Evidence 702, 703, or

16  705 during its case-in-chief at trial, or during its rebuttal." Fed. R. Crim. P. 16(a)(1)(G). The

17  disclosure must contain "a complete statement of all opinions"; "the bases and reasons for them";

18  "the witness's qualifications"; and "a list of all other cases in which, during the previous 4 years,

19  the witness has testified as an expert." *Id*. To the extent Defendant contends the September 6,

20  2024 disclosure is insufficient, for the most part, Defendant fails to explain why.[3]

21         Defendant specifically takes issue with Item # 25 in the initial witness disclosure. Doc.

22  531 at 2; Doc. 531-1 at 5 ("25. It is a common practice for drug traffickers and their associates to

23  use terms such as 'errands' or 'favors' to reference acts performed in furtherance of possessing

24  and/or distributing narcotics and drug proceeds.".) However, that opinion was omitted from the

25  Government's amended witness notice, so it appears that the Government no longer intends to

26

---

27  [3] The Defense cites *United States v. Cruz*, 363 F.3d 187, 194 (2d Cir. 2004), for the proposition that "[a]n expert witness disclosure must include every interpretation of a phrase or word and the basis for each such interpretation."

28  *Cruz* does not articulate such a rule. Rather, it reiterates that the Government may elicit expert testimony about drug trade jargon, so long as the court properly performs its gatekeeping role under *Daubert*. *Id*. at 194–97.

elicit testimony on that subject. Therefore, the Defendant's objection to Agent Riley testifying on that subject is **DENIED AS MOOT**.

Referencing Paragraph No. 10 in the amended disclosure, the Defense also objects that Agent Riley appears to be planning to act "as a conduit for others['] out-of-court in custody statements." (Doc. 589 at 1.)[4] *United States v. Vera*, 770 F.3d 1232 (9th Cir. 2014), cited by Defendant, offers a thorough explanation why and when such testimony may be of concern:

> The Second Circuit's opinion in *United States v. Mejia*, 545 F.3d 179 (2d Cir. 2008), illustrates how case agent expert testimony can violate a defendant's Confrontation Clause rights. The defendants in *Mejia* were members of the MS–13 gang who were being tried for racketeering and related charges. *See id*. at 183. An agent qualified as a gang expert, *see id*. at 193–94, identified custodial interrogations of MS–13 members as at least a partial basis for his testimony "that MS13 taxed non-member drug dealers," "that MS–13 treasury funds were used to purchase narcotics and that MS–13 members used interstate telephone calls to coordinate activities." *Id*. at 199. This testimony was directly relevant to several material issues in the case, including whether MS13 was an enterprise, had an effect on interstate or foreign commerce or engaged in narcotics trafficking. *See id*. at 200.
>
> The agent's testimony violated the Confrontation Clause, however, because he presented testimonial hearsay "in the guise of an expert opinion," *id*. at 199 (quoting *United States v. Lombardozzi*, 491 F.3d 61, 72 (2d Cir. 2007)), rather than presenting the information to explain a bona fide expert opinion. The *Mejia* court was "at a loss in understanding how [the agent] might have 'applied his expertise' to these statements before conveying them to the jury." *Id*. Most problematically, the agent's drug tax testimony "was based directly on statements made by an MS–13 member in custody (during the course of this very investigation)." *Id*. (emphasis omitted). To form his drug tax opinion, therefore, the agent did not have to conduct a "synthesis of various source materials" or apply any of "his extensive experience [or] a reliable methodology." *Id*. at 197 [ ]. Instead, the agent "communicated out-of-court testimonial statements of cooperating witnesses and confidential informants directly to the jury in the guise of an expert opinion." *Id*. at 198 [ ]. The agent's direct repetition of testimonial hearsay about the drug tax "impugn[ed] the legitimacy of all of his testimony," leading the court to suspect he had merely summarized an investigation conducted by others, rather than applying his expertise to draw his own conclusions. *Id*. at 199. The court therefore held that the agent's "reliance on and repetition of out-of-court testimonial statements made by individuals during the course of custodial interrogations violated [the defendants'] rights under the Confrontation Clause of the Sixth Amendment." *Id*.

---

[4] Defendant earlier suggested this objection might be more broadly applicable to Paragraphs 10 through 13 of the amended declaration. (*See* Doc. 563 at 1–2).

14

*Vera*, 770 F.3d at 1238 (citations truncated). In *Vera*, a detective, Franks, who served both as a gang expert witness and as a percipient witness, testified that the Bishop Manor neighborhood fell within the territory of the Minnie Street Lopers gang; and that the gang controlled narcotics sales within that neighborhood and the surrounding areas by requiring any non-member drug dealers in the area to pay a tax. *Id*. Because Franks knew from reviewing intercepted telephone calls that one individual, Salvador, did not pay taxes to anyone else in the neighborhood, Franks concluded Salvador was "one of the leaders of the narcotics trade in Bishop Manor." *Id*. Franks also testified about a recorded phone call between Salvador and another individual that was played for the jury, opining that a rival gang was trying to tax Salvador because they believed his friend was selling drugs within their territory. *Id*. at 1238–39. Based on his understanding that the leader of one neighborhood gang is generally the person who pays taxes to the higher-ranking gang in another area, Franks opined that Salvador was "[m]ore than likely the leader" of the Minnie Street Lopers in Bishop Manor. *Id*. at 1239.

The defendants in *Vera* argued that Franks impermissibly acted as a conduit for hearsay evidence because he directly "imparted important testimonial facts gleaned from his exposure to gang members and affiliates" without applying any independent judgment. *Id*. The Ninth Circuit disagreed because the detective "applied his experience to his observations to form expert opinions about the Minnie Street Lopers and their tactics." *Id*. The panel's explanation is informative:

> Franks testified he had extensive training about and experience with gangs, including some formal classroom training, his time on the Santa Ana Gang Task Force and his work at the Santa Ana Police Department as a gang homicide investigator and gang suppression detective. He was familiar with the Minnie Street Lopers gang in particular from his contacts with members when he worked as a deputy sheriff in the jail, when he patrolled the area and when he transferred to the gang unit of the Santa Ana Police Department. Unlike the gang expert in *Mejia*, nothing in Franks' testimony suggests that he was directly repeating what someone else told him about the Minnie Street Lopers during this or any other investigation. Rather, his testimony that gangs "control the narcotics trafficking in an area" by maintaining control "of selling drugs to buyers" and "of the money," and by requiring "other drug dealers in that area that are not part of that gang" to "pay what's called a tax to that gang," distilled and synthesized what he had learned through his experience. *See Mejia*, 545 F.3d at 197

(implying that the "synthesis of various source materials" constitutes permissible expert testimony).

More importantly, Franks did not impart this information for its own sake, but to explain the basis for his expert opinion that Salvador was "one of the leaders of the narcotics trade in Bishop Manor." He testified that he formed this opinion by reviewing the wiretapped telephone calls, learning that Salvador did not pay taxes to anybody in the neighborhood and applying his knowledge and experience of gang practices to deduce the significance of that information. He further applied this expertise to explain the meaning of a recorded phone call between Salvador and a friend, Walter, that was played for the jury. According to Franks, Walter told Salvador in the call that members of a rival gang believed Walter was "slinging for Salvador" within their territory and were looking for Salvador to verify that he had paid the required tax. Based on his knowledge that the leader of a neighborhood gang is generally responsible for paying taxes to a higher-ranking gang, Franks testified that the phone call further supported his opinion that Salvador was in charge of narcotics trafficking in Bishop Manor.

Franks' expert opinion therefore was not merely repackaged testimonial hearsay but was "an original product" that could have been "tested through cross-examination," [*United States v. Gomez*, 725 F.3d [1121,] at 1129 [(9th Cir. 2013)] [ ], although the defendants declined to do so. Because Franks "appl[ied] his training and experience to the sources before him and reach[ed] an independent judgment," his testimony complied with Crawford and the Confrontation Clause. *Id.* [ ]

*Vera*, 770 at 1238–40. Based upon the showing made in the expert notice, it appears that Agent Riley's testimony comports with *Vera.* However, Defendant may renew this objection in the event Agent Riley's testimony strays beyond the confines of *Vera.*

Finally, Defendant objects that Agent Riley's planned testimony will "usurp the function of the jury insofar as he is detailing what is or are common practices of drug dealers." (Doc. 589 at 2.) Defendant identifies the following as specific areas of concern:

For example, Item #11 criminalizes family members trying to make bail for loved ones.

Item #13 discusses common practices of mailings, but the evidence in this case is that defendant mailed one package.

Item #14 discusses the "common practice" of paying associates in drugs. There is no such quid pro quo in any wiretap or text message with defendant.

Item #15 says it is the "common practice" to pass phone numbers

among each other. Here, we are talking about defendant's relatives asking her for the phone number of JR Torrecillas.

Item #18 addresses using females.

(Doc. 589 at 2–3.) Defendant contends that these items of proposed evidence are "unduly prejudicial" and that the jurors can determine for themselves the reasons for the actions of defendant in this case. (*Id.* at 3.)

The Court finds that Agent Riley is qualified on the topics of the structure and activities of drug trafficking organizations and the modus operandi of drug trafficking organizations and that his knowledge on this topic is reliable based upon his formal training provided by the DEA and on his on-the-job training and experience with this agency. On the other hand, Agent Riley will not be allowed to testify on matters which are not beyond the lay experience of jurors. The Court will not permit testimony as to the the second sentence of paragraph 18, and there must be adequate foundation for the opinion in paragraph 11.

### 4.     Government's Motion to Admit Lay Opinion Testimony from Agent Varela (Doc. 542 at 20–21.)

The Government indicates that it intends to elicit lay opinion from Special Agent Varela, who monitored the intercepted communications at issue in this case. (Doc. 542 at 20–21.) The Government anticipates that Agent Varela will offer lay opinions as to the interpretation of ambiguous statements in the intercepted telephone calls based on his familiarity with this investigation and his general training and experience conducting drug trafficking investigations, including narcotics wiretap investigations. (*Id.*)

Rule 701 allows a lay witness to offer opinions that are (a) "rationally based on the witness's perception," (b) "helpful" to the jury, and (c) "not based on scientific, technical, or other specialized knowledge within the scope of" expert testimony.

Rule 701(a) contains a personal knowledge requirement. The advisory committee notes to Rule 701 clarify that 701(a) is "the familiar requirement of first-hand knowledge or observation," Fed. R. Evid. 701 advisory committee notes (1972), and we have held that the personal knowledge requirement under Rule 602 is the same as that under Rule 701(a), *see United States v. Simas*, 937 F.2d 459, 464–65 (9th Cir. 1991). [¶] In presenting lay opinions, the

17

1

> personal knowledge requirement may be met if the witness can
> demonstrate firsthand knowledge or observation.

2

3   *United States v. Lopez*, 762 F.3d 852, 864 (9th Cir. 2014)

4       In applying Rule 701 to the lay opinion testimony of law enforcement officers, the Ninth

5   Circuit has held that an investigator's interpretation of intercepted phone calls may meet Rule

6   701's "perception" requirement when it is an interpretation "of ambiguous conversations based

7   upon [the investigator's] direct knowledge of the investigation." *United States v. Gadson*, 763

8   F.3d 1189, 1206 (9th Cir. 2014) (internal citations and quotations omitted). "Lay witness

9   testimony regarding the meaning of ambiguous conversations based on the witness's direct

10  perceptions and experience may also prove 'helpful to the jury' for purposes of Rule 701." *Id.* at

11  1207. There are some exceptions:

12

> As the drafters of Rule 701 noted, "meaningless assertions which
> amount to little more than choosing up sides" should be excluded
13  > for lack of helpfulness. Fed. R. Evid. 701 advisory committee's
> note. In addition, testimony that relies on or conveys hearsay
14  > evidence, such as when an officer relies on the truth of a third
> party's statement as the basis for an interpretation of a statement in
15  > an intercepted phone call, is also inadmissible, both because it
> would not be based on the officer's own perceptions, and would not
16  > be helpful.

17  (*Id.* at 1208 (internal citations omitted).)

18       *United States v. Freeman*, 498 F.3d 893, 904–05 (9th Cir. 2007), cited by the Government

19  (Doc. 542 at 13), offers a helpful example concerning the testimony of Agent Bob Shin regarding

20  coded communications:

21

> The record reveals that the majority of [Agent] Shin's lay testimony
> consisted of his interpretations of ambiguous conversations based
22  > upon his direct knowledge of the investigation. Although . . . Shin
> was not a participant in the conversations he interpreted, his
23  > understanding of ambiguous phrases was based on his direct
> perception of several hours of intercepted conversations—in some
24  > instances coupled with direct observation of Mitchell and Brown—
> and other facts he learned during the investigation. . . Such
25  > testimony also proved helpful to the jury in determining what
> Freeman, Mitchell, and Brown were communicating during the
26  > recorded telephone calls.

27  *Freeman*, 498 F.3d at 904–05.

28       Defendant points out, correctly, that the Government has not specified exactly what lay

18

1   opinions Agent Varela will offer. (Doc. 554.) Defendant also cites *United States v. Garcia*, 413

2   F.3d 201, 215 (2d Cir. 2004), for the proposition that when an investigator relies on the entirety of

3   information gathered in an investigation to offer opinions as to the defendant's "culpable role" in

4   a conspiracy, this improperly strays into the province of the jury. (*See* Doc. 554 at 2.) To the

5   extent that Agent Varela will interpret ambiguous statements in recorded calls, this testimony

6   may be given under *Freemen*. He may not, however, offer any opinions that invades the province

7   of the jury including, for example, his opinion as to Defendant's conduct. However, because the

8   admissibility of lay opinion testimony is likely to depend on the specific testimony offered in the

9   context of the case overall, the Court reserves judgment on these issues for trial.

**B.**      **Motions Pertaining to Co-Conspirator Statements, Including Defendant's Interview**

**Statements**

**5.**      **Government's Motion to Admit Out-of-Court Statements of Co-Conspirators**

**(Docs. 541 (Redacted Version);** ███████████████████████

**Defendant's Motion in Limine # 1 to Preclude Speculative Statements She**

**Made During Her Interview with Law Enforcement (Doc. 530); Defendant's**

**Motion in Limine #4 to Exclude Statements Made by JR to Others (Doc. 533)**

17   The Government moves to introduce several categories of out-of-court statements made

18   by Defendant's alleged co-conspirators in furtherance of an alleged conspiracy to distribute and

19   possess with an intent to distribute controlled substances. (Doc. 541.) Defendant opposes the

20   motion on the ground that the statements the Government relies upon to establish Defendant's

21   role in the conspiracy are "misleading and more prejudicial than probative under Rule 403,"

22   referencing her first motion in limine that asserts said statements should be excluded as

23   speculation. (Docs. 530, 555.) She also raises some specific objections to the admission of

24   statements made by JR to Justin Riddle (Doc. 533).

a.      *Legal Standard*

26   Co-conspirator statements are admissible where the government demonstrates by a

27   preponderance of the evidence that (1) a conspiracy existed when the statement was made; (2)

28   both the declarant and the defendant against whom the statement is offered were members of that

conspiracy; and (3) the statement was made in the course and in furtherance of the conspiracy. *Bourjaily v. United States*, 483 U.S. 171, 175–76 (1987). In making a factual determination of the admissibility of co-conspirator statements under this rule, the Court may consider the statements themselves as well as any other independent evidence of the conspiracy. *Id*. at 180–81; *see* Fed. R. Evid. 104(a). "[T]he court is not bound by evidence rules." Fed. R. Evid. 104(a). Also, the Confrontation Clause does not require the court to make an inquiry into the independent indicia of the reliability of the statement. *Bourjaily*, 483 U.S. at 182; *see also United States v. Allen*, 425 F.3d 1231, 1235 (9th Cir. 2005) ("[C]o-conspirator statements are not testimonial and therefore beyond the compass of *Crawford's* holding."); *United States v. Gomez*, No. 1:18-CR-00002-JLT-SKO, 2022 WL 1778231, at *6 (E.D. Cal. June 1, 2022).

In determining whether a conspiracy existed and who were its members, the scope of a "conspiracy" under Rule 801 is broader than the scope of a criminal conspiracy, because Congress intended the co-conspirator exception under Rule 801 "to carry forward the universally accepted doctrine that a joint venturer is considered as a coconspirator for the purposes of this rule even though no conspiracy has been charged." Fed. R. Evid. 801, Note to Subdivision 801(d)(2)(E) (1974) (citing *United States v. Rinaldi*, 393 F.2d 97, 99 (2d Cir. 1968); *United States v. Spencer*, 415 F.2d 1301, 1304 (7th Cir. 1969)). The only question, therefore, is "whether there was proof of a sufficient concert of action to show the individuals to have been engaged in a joint venture." *United States v. Manning*, 56 F.3d 1188, 1197 (9th Cir. 1995). A "conspiracy" may therefore be broader than the conspiracy charged in the indictment. *United States v. Marino*, 277 F.3d 11, 25–26 (1st Cir. 2002). Relatedly, Rule 801 applies even where there is no conspiracy charged in the indictment. *United States v. Fries*, 781 F.3d 1137, 1151–52 (9th Cir. 2015); *see also Manning*, 56 F.3d at 1197 ("[A] coconspirator's statement is admissible upon proof that it was made in furtherance of a conspiracy, notwithstanding the fact that the indictment does not contain a conspiracy count.") (internal citation and quotation omitted).

The Government "must produce some independent evidence which, viewed in light of the coconspirator statements, establishes the requisite connection between the accused and the conspiracy." *United States v. Castaneda*, 16 F.3d 1504, 1507 (9th Cir. 1994). "Once a conspiracy

1    has been established, evidence of only a slight connection with it is sufficient to establish a

2    defendant's participation in it." *Id.* at 1510. The defendant need not be present at the time the

3    unindicted or indicted co-conspirator made the declaration. *Sendejas v. United States*, 428 F.2d

4    1040, 1045 (9th Cir. 1970); *see also United States v. Torres*, 742 F. App'x 244, 246 (9th Cir.

5    2018) ("It is not relevant that Torres was not present or may not have been a part of the

6    conspiracy when the conversations were made.").

7         A statement is "in furtherance" of the conspiracy if it "further[s] the common objectives

8    of the conspiracy or set[s] in motion transactions that are an integral part of the conspiracy."

9    *United States v. Yarbrough*, 852 F.2d 1522, 1535–36 (9th Cir. 1988) (internal citation and

10   quotation omitted); *United States v. Rivas Gomez*, No. 1:18-CR-00002-JLT-SKO, 2022 WL

11   2239117, at *3 (E.D. Cal. June 22, 2022). Examples include statements that "prompt further

12   action on the part of conspirators," are "made to 'reassure' members of a conspiracy's continued

13   existence" or "allay a conspirator's fears," when they are made to report information to "higher

14   ups" of the group, or when they are made to keep co-conspirators "abreast of an ongoing

15   conspiracy's activities." *Yarbrough*, 852 F.2d at 1535–36 (collecting cases). "In determining

16   whether a statement is made 'in furtherance of a conspiracy, the court looks to the declarant's

17   intent in making the statement, not the actual effect of the statement." *United States v. Williams*,

18   989 F.2d 1061, 1068 (9th. Cir. 1993).

19              b.   *Evidence Demonstrating a Conspiracy and Defendant's Role Therein*

20        The Government offers several types of evidence to establish the existence of a

21   conspiracy, much of which has been discussed in the Background section of this order.

22

23

24

25

26

27

28



In addition, as mentioned, Defendant wired money to various individuals in Mexico on December 28, 2021, January 10, 2022, January 17, 2022, and January 24, 2022, in amounts between $900 and $1,000. (GARZA 2546, 2704.)

There is independent evidence that Defendant and JR acted together to mail a parcel containing drugs to a co-conspirator in New Mexico. As detailed above, intercepted communications between Garza and JR suggest that both traveled together to a post office, where Defendant mailed a parcel on January 27, 2022. Surveillance footage at the post office confirmed that Defendant filled out postal forms and mailed a parcel to a residence in New Mexico. (GARZA 264.) Over the next several days, law enforcement intercepted communications between JR and the intended recipient of the parcel evidencing that the parcel contained drugs and that JR and the intended recipient had a prior drug dealing history. During this period, JR communicated with Garza several times to have her track the parcel, which was later intercepted and found to contain several pounds of methamphetamine and a smaller amount of cocaine. The package was labeled with another sender's name, evidencing Garza's attempt to distance herself from its contents.

A few weeks later, on February 9, 2022, JR and Defendant traveled from Fresno to Sanger in two separate cars. (Doc. 539-1 at 94–95.) Before the trip, JR communicated to Gladitza Vasquez (his girlfriend and coconspirator) that he needed "Alma to go do something for me. Well, I need her to go behind me or me behind her to go do something." (Doc. 539-1 at 94–95.)

Intercepted calls evidenced that this trip was to drop off the "bad ones" that Juan Valencia Jr. was storing for JR. (*Id.*) Surveillance observed one car driven by Torrecillas Urias Jr. and another driven by defendant depart together, travel to Valencia's residence, and then travel to Sanger, in tandem. (Doc. 541 at 10.) Shortly after they arrived at a residence in Sanger, the defendant departed. (*Id.*) And moments later, JR and Valencia Jr. delivered a bag to an individual (Abel Lozano) who took the bag into the Sanger residence. (*Id.*) During the execution of a search warrant at that residence two days later (Feb. 11), agents found a bag consistent with this one inside the garage. (*Id.*) From Lozano's garage, agents seized about 7,000 blue and green M/30 suspected fentanyl pills. (*Id.*)

Between the delivery and the search, on February 10, JR was intercepted on his phone discussing the delivery with the recipient, Abel Lozano. (*Id.*) During the call, the two discussed that there was a total of "6,630," of "the green ones" and "7" with the "dark ones, the blue ones." (*Id.*) This was corroborated by the residential search. (*Id.*) Officers found about 6,250 blue and green pills laced with fentanyl and methamphetamine. (*Id.*) When the Sanger residence was searched, Abel Lozano's phone was seized. (*Id.*) The phone contained messages between Lozano and another individual (Isidro Zuriel Cruz Vizcarra). (*Id.* at 10–11.) Those messages evidenced that Cruz Vizcarra served as an intermediary between Lozano and JR. (*Id.* at 11.) Specifically, the two discussed (1) the product that JR could offer and (2) JR's arrival for the delivery. (*Id.*)

On February 14, 2022, intercepted communications between JR and Alejandro Guzman (Defendant's brother) evidenced that Guzman would be traveling south for JR. (*Id.*) JR and Brayan Cruz were then intercepted discussing the quality of the pills that were going to arrive and the fact that the resupply was going to include methamphetamine. (*Id.*) Guzman was then surveilled traveling south to a parking lot in Riverside CA, obtaining a white bag from a person there in the parking lot, and then driving back toward Fresno. (*Id.*) Guzman and JR communicated about the trip along the way. (*Id.*) The investigative team coordinated a traffic stopped on Guzman in Kern County. (*Id.*) A search of the vehicle resulted in the seizure of approximately 1.56 kg of M/30 fentanyl pills (approximately 15,000 pills) and 4.75 pounds of crystal methamphetamine. (*Id.*)

That same night, when Guzman stopped responding to JR's messages, JR began to suspect that Guzman had been arrested. (Doc. 539-1 at 108–14.) He called Garza and the two discussed the "errand" JR had sent Guzman on and the ramifications of the fact that Guzman was now not answering. (*Id.*) JR also spoke with Justin Riddle about the same issue and the two discussed that some of the drugs Guzman was transporting were intended for Riddle. (Doc. 541 at 11.) Around the same time, JR and Garza continued to discuss their failed attempts to reach Guzman by phone and eventually talked about efforts to bail him out of custody. (Doc. 539-1 at 108–14.) The next day, the Garza informed JR that she would be picking up Guzman from jail, and she agreed to get information about the circumstances of the traffic stop from Guzman to relay to JR. (Doc. 541 at 11–12.)

     c. *Defendant's Speculation Objections*

Defendant does not actually appear to object to the Court finding that all these individuals were members of a conspiracy during the relevant timeframe. (*See generally* Doc. 555.) Rather, Defendant references her Motion in Limine No. 1, which argues that certain statements relied upon by the Government to support the existence of the relevant conspiracy should not be admitted into evidence because they are misleading and more prejudicial than probative under Rule 403. (*Id.*) In the referenced Motion in Limine No. 1, among other things, Defendant maintains that her "solicit[ed] speculation" should be excluded under Rules 602 and 403. (*See* Doc. 530.)[5]



[5] The way the parties have "organized" their motions has multiplied the proceedings in this case, as similar issues have been raised and briefed in multiple sets of motions. The Court has endeavored to capture all of the essential arguments, though it has been challenging to do so.

1

2

3

4

5

6

7

8        Defendant separately challenges statements she made about the first car trip to a house in

9 Sunnyside where she went with J.R. and he picked up a duffle bag. (Doc. 530 at 2.)

10

11                              Therefore, Defendant generally objects that

12 there "is no corroborating evidence to support her statement that it occurred." (Doc. 530 at 2.)

13

14

15

16

17

18

19

20

21        Defendant likewise objects to questions about the second trip—the one in which she

22 traveled in a separate car from JR. (*See* Doc. 530 at 2–3.)

23

24

25

26                          The Court finds Defendant's objection to

27 this evidence as "speculative" to be unpersuasive and **OVERRULES** that objection.

28        Finally, Defendant objects to the admission of her statements about her relatives'

involvement in drug trafficking in Mexico. Defendant contends that her statements about these relatives were not based on personal knowledge. (Doc. 530 at 3.) Again, the evidence proffered by the Government suggests otherwise. ███████████████████████████████████

███████████████████████████████████████████████████████████████████████

███ "Personal knowledge may consist of direct observations or reasonable inferences that are "grounded in observation or other first-hand personal experience." *IA Collaborative, LLC v. Fathom Loop, LLC*, No. 22 C 5237, 2024 WL 2938856, at *3 (N.D. Ill. June 11, 2024).

> ### d.   *Defendant's Corpus Delicti Objection*

Finally, the Defendant makes a related objection to the admission of Defendant's statements about the first trip on the ground that the statement "violate[s] the *corpus delicti* rule unless the government first establishes by independent evidence that the event referred to occurred." (Doc. 559 (citing *United States v. Lopez-Alvarez*, 970 F.2d 583, 591 (9th Cir. 1992); *United States v. Niebla-Torres*, 847 F.3d 1049, 1054–1055 (9th Cir. 2017)).) This Court recently discussed the application of the corpus delicti rule to confessions:

> Very generally, "[w]hen the government seeks to rely on a defendant's confession or admission to meet its burden of proof, the *corpus delicti* doctrine provides that the government is required to provide corroborative evidence that the criminal conduct actually occurred and that the confession/admission was trustworthy." *United States v. Cerna*, No. CR 08-0730 WHA, 2011 WL 838897, at *14 (N.D. Cal. Mar. 3, 2011) (citing *United States v. Lopez–Alvarez*, 970 F.2d 583, 592 (9th Cir. 1992); *see also United States v. Delgado*, 545 F.3d 1195, 1206 (9th Cir. 2008) ("Although a confession must be corroborated by independent evidence, the corroboration need not independently establish any element beyond a reasonable doubt, but must merely fortify the truth of the confession."). However, "the *corpus delicti* doctrine operates as a rule about the reliability of uncorroborated confessions." *United States v. Connor*, No. 19-CR-58-JED, 2019 WL 6050722, at *12 (N.D. Okla. Nov. 15, 2019) (citing United States v. Shunk, 881 F.2d 917, 919–20 (10th Cir. 1989)). <u>"It is not a rule about the admissibility of confessions."</u> *Id.* As was the case in *Connor*, Defendant "fails to cite a single case where a court has relied on the *corpus delicti* rule to bar a defendant's confession at trial." *Id.* Therefore, to the extent Defendant is attempting here to exclude his confession entirely as uncorroborated, the *corpus delicti* doctrine does not support such a procedural maneuver. *See United States v. Neal*, Crim. No. 3:09CR17, 2009 WL 3112137, at *1 (W.D.N.C. Sept. 23, 2009) (declining to rule on a corpus delicti-based motion in limine because "to issue such a ruling at this point in time would deny the Government the opportunity to present its evidence,

evidence which may well include corroboration"); *Cerna*, No. CR 08-0730 WHA, 2011 WL 838897, at *14 (N.D. Cal. Mar. 3, 2011) ("Requiring the government to provide corroborative evidence before allowing it to introduce any confessions or admissions would pose an onerous and unnecessary burden given that most elements—if not all elements—of the crimes charged will not be solely based on a defendant's confession or admission. A better course of action is for defendants to bring *corpus delicti* motions when those motions are ripe after the presentation of evidence."); *United States v. Cerna*, CR 08-0730, 2011 WL 2119304, at *1 (N.D. Cal. May 27, 2011) ("It cannot be determined whether the *corpus delicti* rule has been violated until presentation of the evidence is complete.").

*United States v. Racion*, No. 1:20-CR-00020-JLT, 2022 WL 3908096, at *3 (E.D. Cal. Aug. 30, 2022) (emphasis added). To the extent the Defense contends the *corpus delicti* rule has been violated as to any aspect of Defendant's confession after the close of the government's case, she may renew her motion at that time. Thus, the motion is **DENIED WITHOUT PREJUDICE**.

     a.  *Statements the Government Intends to Offer*

A trial, the government plans to introduce the following categories of statements that occurred between the dates of the charged conspiracy: November 2, 2021 through March 31, 2022.





Given all the evidence discussed above, and the fact that Defendant's objections to the consideration of her own statements as speculative have been rejected, the Court finds by a preponderance of the evidence that all the individuals for whom communications are listed above were part of the conspiracy to distribute and possess with intent to distribute the charged controlled substances and that these categories of communications were made in furtherance of the conspiracy.

    a.  *Defendant's Motion in Limine #4 to Exclude Statements Made by JR to Others (Doc. 533)*

Defendant moves to exclude as hearsay all conversations between JR and Riddle and JR and others after JR asked Defendant to mail the package on the ground that there is no foundation for a finding that Defendant joined a conspiracy to possess with intent to distribute a federally controlled substance and therefore that there is no basis to render those statements non-hearsay.

(Doc. 533 at 1.) This motion is without merit for the reasons set forth above.

Defendant has moved to exclude as hearsay, statements made between JR and Justin Riddle concerning the sale of meth and cocaine by JR to Riddle before the call by JR to Defendant asking her to mail a package for him. (Doc. 533 at 1.) Defendant argues that, absent a showing that Defendant was a conspirator at the time of the challenged conversations, those statements are hearsay as to Defendant. (*Id*.)

The government counters that the statements at issue were made after Defendant joined the conspiracy and, apparently, it does not seek to admit statements made before she joined the conspiracy. (Doc. 572) Thus, the motion is **DENIED**.[6]

**6.** **Defendant's Motion in Limine #6 to Admit Out of Court Statements of Others for Non-Hearsay Purposes.**

Defendant moves for permission to offer certain out of court statements made by others on the grounds that they are not hearsay because she plans to offer them for non-hearsay purposes. (*See generally* Doc. 539.) Defendant specifically references the following recorded telephone calls[7]: Nos. 31, 67, 167, 249, 276, 354, 358, 394, 395, 397, 399, 403, 406, 410, 431, 442, 660, 664, 669, 686, 728, 944, 1333, 1759, 1774, 1990, 2007, 2011, 2020, 2022, 3120, 3141, and 3213.[8] Undisputed Calls

      a. *Undisputed Calls*

The Government does not object as to call Nos. 31, 67, 249, 276, 397, 399, 403, 406, 431, 1333, 1759, 1774, 1990, 2007, 2011, 2020, 2022, 3120, 3141, 3213. (Doc. 573.) Accordingly, the motion is **GRANTED** as to the calls to which there is no objection.

      b. *Disputed Calls*

Defendant offers several generalized justifications for the admission of the remaining calls, including the uncontroversial proposition that statements offered to prove the speaker's

---

[6] On the other hand, it is widely established that coconspirator statements made prior to the defendant joining the conspiracy are admissible provided the defendant has sufficient knowledge of the scope of the conspiracy. *United States v. Umagat*, 998 F.2d 770, 772 (9th Cir. 1993); *United States v. Segura-Gallegos*, 41 F.3d 1266, 1272 (9th Cir. 1994).

[7] At the hearing on the motions in limine, the defense withdrew the request related to Call 803.

1  state of mind or intent at the time the statement is made are not hearsay, and that statements

2  offered "only for context and not for the truth of the matters asserted" are not hearsay. (Doc. 539

3  at 1–2.) The Government opposes, arguing that these calls are either entirely inadmissible or that

4  only one side of each conversation is subject to any kind of hearsay exception. (Doc. 573 at 3–6.)

5  In reply, Defendant attempts to explain the basis for admission of these calls, though the

6  arguments are presented in a cursory manner. (Doc. 592.)

7                              i.        Legal Standards

8          Defendant attempts to justify admission of the disputed conversations either as non-

9  hearsay or under one or more hearsay exceptions. First, she suggests that some of the

10  conversations contain statements that are not hearsay at all. Rule 801(c) defines hearsay as "a

11  statement . . . offered in evidence to prove the truth of the matter asserted." A statement may be

12  admissible as non-hearsay if the fact that the statement was made, not the truth of the statement,

13  was significant. *Calmat Co. v. U.S. Dep't of Lab.*, 364 F.3d 1117, 1124 (9th Cir. 2004). For

14  example, as the Government concedes (Doc. 573 at 2), under many circumstances commands or

15  questions are not hearsay. *See Baines v. Walgreen Co.*, 863 F.3d 656, 662–63 (7th Cir. 2017)

16  ("[A] command is not hearsay because it is not an assertion of fact.").

17          Under Federal Rule of Evidence 803(3), "[a] statement of the declarant's then-existing

18  state of mind (such as motive, intent, or plan) or emotional, sensory, or physical condition (such

19  as mental feeling, pain, or bodily health), but not including a statement of memory or belief to

20  prove the fact remembered or believed…" is admissible regardless of the declarant's availability.

21  However, "[t]he state-of-mind exception does not permit the witness to relate any of the

22  declarant's statements as to why he held the particular state of mind, or what he might have

23  believed that would have induced the state of mind." *United States v. Emmert*, 829 F.2d 805, 810

24  (9th Cir. 1987) (quoting *United States v. Cohen*, 631 F.2d 1223, 1225 (5th Cir. 1980) ("If the

25  reservation in the text of the rule is to have any effect, it must be understood to narrowly limit

26  those admissible statements to declarations of condition—"I'm scared"—and not belief—"I'm

27  scared because Galkin threatened me.")). To determine the admissibility of a statement under the

28  state-of-mind exception, the Court must weigh three relevant factors: "contemporaneousness,

30

1    chance for reflection, and relevance." *United States v. Faust*, 850 F.2d 575, 585 (9th Cir. 1988).

2        Defendant also mentions the statement against interest exception as applied to certain of

3    her co-conspirators' statements. (*See* Doc. 592 at 2.) Rule 804 sets forth those hearsay exceptions

4    that apply only if the declarant is unavailable. Among the Rule 804 exceptions is the exception

5    for statements against interest under Rule 804(b)(3)(A). Under that Rule, an unavailable witness's

6    out-of-court statement is admissible as a statement against interest if "a reasonable person in the

7    declarant's position would have made" the statement "only if the person believed it to be true

8    because, when made, it was so contrary to the declarant's proprietary or pecuniary interest or had

9    so great a tendency to invalidate the declarant's claim against someone else or to expose the

10    declarant to civil or criminal liability." Fed. R. Evid. 804(b)(3)(A). If the statement is offered in a

11    criminal case "as one that tends to expose the declarant to criminal liability," the statement must

12    be supported by corroborating circumstances that clearly indicate its trustworthiness. Fed. R.

13    Evid. 804(b)(3)(B).

14             ii.    Analysis

15        Call 354 (Doc 539-1 at 23–24) occurred on January 29, 2022 at 11:23 a.m. and is between

16    JR and Defendant. During the conversation, JR asks Garza what she is doing (napping), why she

17    did not answer her phone the day before (no explanation) and did she "ever track that shit?" to

18    which she responded, "Hold on, let me check re-, let me check right now." Call 358 (Doc 539-1

19    at 25–27) occurred on January 29, 2022 at 11:32 a.m., and it is also between JR and Defendant,

20    during which Garza reports that the package was due to arrive at 6 p.m.

21        There are any non-hearsay questions asked by JR in the earlier call. *See Baines v.*

22    *Walgreen Co.*, 863 F.3d 656, 662–63 (7th Cir. 2017) ("A command is not hearsay because it is

23    not an assertion of fact.") However, there is no showing why Defendant's <u>responses</u> do not

24    obviously fall within any exception to hearsay, and the Court cannot determine for what non-

25    hearsay purpose Defendant could offer them. In the second call, JR asks no questions and issues

26    no commands. None of JR's statements implicate him in a crime.

27        In her reply, Defendant describes this call as "JR calling defendant on Saturday and

28    defendant conveying it is going to arrive at 6:00 p.m." and then generally suggests these are

"statements of intent (or of lack of intent) by defendant." (Doc. 592 at 2.) However, it is unclear how Defendant stating that a package will arrive at 6:00 p.m. goes to her intent. Without a basis for admitting Defendant's statements in this call, it is unclear how Defendant could utilize (and therefore establish the relevance of) any non-hearsay questions posed by JR. The motion as to these calls is **DENIED**.

Call 358 (Doc 539-1 at 25–27) is between JR and Defendant, during which they discuss tracking a package. To the extent there are any non-hearsay questions asked by JR in this call, *see Baines v. Walgreen Co.*, 863 F.3d 656, 662–63 (7th Cir. 2017) ("A command is not hearsay because it is not an assertion of fact."), Defendant's <u>responses</u> do not obviously fall within any exception to hearsay, and the Court cannot determine for what non-hearsay purpose Defendant could offer them. In her reply, Defendant simply describes this call as "JR calling defendant on Saturday and defendant conveying it is going to arrive at 6:00 p.m." and then generally suggests these are "statements of intent (or of lack of intent) by defendant." (Doc. 592 at 2.) However, it is unclear how Defendant stating that a package will arrive at 6:00 p.m. goes to her intent. Without a basis for admitting Defendant's statements in this call, it is unclear how Defendant could utilize (and therefore establish the relevance of) any non-hearsay questions posed by JR. The motion is therefore **DENIED WITHOUT PREJUDICE** as to this call.

Call 167 (Doc 539-1 at 10–14) is between JR and Justin Riddle discussing the sale of firearms. It is totally unclear how these statements are relevant to the Defense's case. The motion is **DENIED WITHOUT PREJUDICE** as to this call.[9]

It appears that in addressing Call 167, Defendant may have meant to reference Call 397, (*see* Doc. 592 at 2), in which JR asked Defendant to "track that shit real quick, please," and she responds "okay." (Doc. 539-1 at 33.) JR's question/instruction is non-hearsay and therefore admissible, but Defendant's response is not. To the extent the question standing alone is relevant, it is admissible, so the motion is **GRANTED IN PART**. Defendant's response is hearsay.

Similarly, call 395 (Doc 539-1 at 31) is between JR and Defendant during which JR states

---

[9] In her reply, Defendant describes Call #167 as "JR calling defendant asking if she tracked that shit after asking why she had not been answering her phone, and defendant's response she will check right now." (Doc. 592 at 2.) But the record demonstrates Call #167 is between JR and Riddle. (Doc. 539-1 at 10–14.)

"Tracking Number. The one where it says tracking number," and Defendant responds "OK. Yes." JR's statements are hearsay. To the extent JR's statements could be categorized as commands, the exchange suffers from the same problems as Call # 358, namely there is no apparent basis for admitting Defendant's <u>response</u> and therefore it is unclear how any non-hearsay elements of the call could be rendered relevant. The motion is **DENIED**.

Call 394 (Doc 539-1 at 28-30) and Call 399 (Doc 539-1 at 28-30) occurred on January 29, 2022 at 3:33 p.m. and 3:40, respectively. The calls involved JR and Justin Riddle discussing the parcel Defendant shipped. In the first call, JR states "let me call my cousin she's sending me a [unintelligible]," which presumably is a reference to the tracking number. The Government argues this call is inadmissible hearsay in its entirety. (Doc. 574 at 4.) In the second call, JR reports that Garza told him that the package would be delivered at 6 p.m. In response, Riddle says that if the package doesn't arrive, he'd "go to the post office tomorrow." JR asks, "Hey, let me know when you can, when you can send that money, yeah?"

Defendant appears to asserts that these calls may be admitted because they constitute a "declaration against interest or instruction by JR." (Doc. 592.) JR's statement "let me call my cousin she's sending me a [unintelligible]" contains both a question ("let me call my cousin") and a statement ("she's sending me a . . ."). In the second conversation, JR's makes a statement about the time the delivery will occur and asks a question about when money will be sent. The statement portions in both conversations appear to qualify as statements against interest[10] and are corroborated by other evidence in the case. Thus, JR's two questions may be admitted as not hearsay.

On the other hand, there no showing that Justin Riddle is unavailable for testimony. In the first call, Riddle's statements provide the substance of the conversation, and the defense has made no showing that Riddle's statements are admissible. Thus, as to Riddle's statements, the motion is **DENIED**.

According to Defendant, certain calls "bear on JR's desire to get the package and defendant's resistance to get involved." (Doc. 592 at 3.) In this category, Defendant places Call

---

[10] Assuming JR testifies and asserts his Fifth Amendment right, he is rendered unavailable for purposes of Rule 804.

33

410 (Doc 539-1 at 43-45) between JR and Jorge Torrecillas, in which the two discuss the parcel shipment. JR states, "Cause Alma is a fucking stupid ass bitch." It appears that Defendant may seek admission of JR's statements in this call as a statement of JR's then-existing state of mind under Rule 803(3), presumably regarding his feelings about the Defendant. The Court agrees with the Government (*see* Doc. 542 at 28) that this call is not an expression of JR's then-existing state of mind because it does not solely pertain to JR's state of mind. Rather, to render this statement relevant to the case, the statement would have to be introduced to demonstrate the alleged reason(s) for the state of mind, namely that JR thought Defendant was stupid because the parcel she mailed to New Mexico was returned to Fresno. Absent any other basis for admission, the motion is **DENIED** as to this call.

Defendant also places Call 442 (Doc 539-1 at 54–57) within the apparent category of "bear[ing] on JR's desire to get the package and defendant's resistance to get involved." In that call, JR and Brayan Cruz discuss marijuana, a package, and JR's displeasure with Defendant.

> CRUZ: So, where is that shit at?
>
> JR: Well, I don't know, bro'. And, it's 'cause the post office is closed today and tomorrow.
>
> CRUZ: Well, I mean, if you can grab it…. You can get it back.
>
> JR: Fuck yeah, nigga'. I'm gonna sit on this bitch [U/I] I don't give a fuck if that bitch goes to jail.
>
> CRUZ :[LAUGHS]
>
> JR: It's gonna be fucked [U/I]
>
> CRUZ: Hey! That chick… if they sent it back, now it's back in track to go to the fucking place.
>
> JR: I don't give a fuck! That bitch is gonna take her fucking, coke [U/I] ass in there and gonna fucking get me my shit.

(*Id.* at 56–57.) Defendant argues that JR's statements are against his interest because they demonstrate that the package, containing narcotics, belongs to him. The Court agrees as to the statements: "JR: Fuck yeah, nigga'. I'm gonna sit on this bitch [U/I] I don't give a fuck if that bitch goes to jail," and "JR: I don't give a fuck! That bitch is gonna take her fucking, coke [U/I] ass in there and gonna fucking get me my shit." There is no showing as to the admissibility as to

1   any other statement related to this exchange and no showing as to the rest of the conversation.

2   To the extent Defendant intends to rely on the then-existing state of mind exception, this

3   conversation suffers from the same defect as Call 410—the state of mind is only relevant insofar

4   as it is connected to the <u>reason</u> for the state of mind.

5       Call 660 (Doc 539-1 at 58-60) is between JR and the Defendant and includes the

6   following exchange:

7           JR: What are we going to do about the post office shit?

8           [VOICES OVERLAP]

9           GARZA: What?

10          JR: What can we do?

11          GARZA: Well, you have to get **Stephanie** to go out to get the
            package.

12
            [VOICES OVERLAP]
13
            JR: Well, nigga, tell her, let's both go tell her cause uh—you put it
14          under her name, I don't want to tell her that I did it or let's both go
            tell her. [PAUSE] Eh!
15
            [BACKGROUND: TRAFFIC NOISE]
16
            GARZA: Well, when?
17
            JR: Eh? Well, today, nigga!
18
            [VOICES OVERLAP]
19
            GARZA: When? Well today I can't. I'm working until eight [8:00].
20
            [VOICES OVERLAP]
21
            JR: [ASIDE: Fuck [U/I]] Well, hit me up when you get out.
22

23   (Doc. 539-1 at 60 (bolding in Defense Doc. 592).) Though JR's questions his instruction may be

24   admissible, Defendant also seeks to admit Defendant's responses. (*See* Doc. 592 at 2

25   (bolding words in Defendant's response).) Yet, Defendant has not advanced a cogent theory for

26   the admission of her responses. The motion is **DENIED** as to this call.

27       Call 664 (Doc 539-1 at 61) is a brief conversation between JR and Stephanie Torrecillas.

28   They exchange information about her doings and whereabouts, and then JR asks, "Can you help

me when you get out?" Stephanie responds: "Yeah. I'll call you." The Government concedes that the question is not hearsay but asserts that the remainder of the call is inadmissible. Indeed, there is no showing that Stephanie is unavailable to testify, and there is no apparent exception for the remainder of this call. The motion is **GRANTED IN PART**. The question is admissible, the response is not.

Calls 669 (Doc 539-1 at 62-67) and 686 (Doc 539-1 at 68-70), are also between JR and Stephanie. During these calls, JR recalls past events to Stephanie. JR's statements do not admit ownership of the package and are not, therefore, statements against his interest. Absent any other theory of admissibility,[11] Court agrees with the Government that these calls are inadmissible hearsay in their entirety. The motion is **DENIED** as to these calls.

Call 728 (Doc 539-1 at 71-72) appears to suffer from the same problem. In general, it discusses past events to the extent they pertain to Defendant and the package and relates to JR buying a gun. The only statement which, even arguably, implicates JR's drug trafficking activity and relevant, is in response to a statement by Riddle, who was talking about having mailed a package to the wrong address and then getting it back from the post office. Riddle then says, "Yeah. Cause UI fuck cause we need that shit dog. Were dying out here." It is unclear if Riddle is referring to the package he misdirected or the package at issue in this case. In response, JR's says, "I know. I'm gonna try and get that shit nigga." Due to the ambiguity of the conversation and the fact that JR's statement is not one made against his interest, the conversation will not be admitted as hearsay. The motion is **DENIED**.

Finally, Call 944 (Doc. 539-1 at 75-77) is between JR and Jorge Torrecillas discussing the parcel. JR asks some questions, which are admissible, but the remainder of the call is inadmissible hearsay. Thus, the motion is **GRANTED IN PART** as to this call.

## C.   Other Government Motions in Limine

### 1.   Motion for Pretrial Authentication of Self Authenticating Business Records (Doc. 542 at 21–23)

The Government moves for a pretrial ruling that certain business records from Intermex

---

[11] Defendant's own descriptions of these calls does not suggest otherwise. (*See* Doc. 592 at 3.)

1   and MoneyGram containing wire transfer information is admissible under Fed. R. Evid. 803(6)),

2   and that the records are self-authenticating under Rule 902(11) and (13), considering certificates

3   of authenticity received. (Doc. 542 at 21–23.) Defendant does not object to this request. This

4   motion is **GRANTED**.

5       **2.**    **Motion for Pretrial Authentication of Self Authenticating Public Records**

6           **(Doc. 542 at 23–25)**

7           a.    *Press Release*

8       The Government moves for a pretrial ruling that a press release issued by the United

9   States Attorney's Office for the Eastern District of California is admissible under Fed. R. Evid.

10  803(8)), and that the document is self-authenticating under Fed. R. Evid. 902(5)(official

11  publications of a public authority). (Doc. 542 at 23–24.)

12      Defendant does not object to the admission of this document generally but does object to

13  the extent it discusses someone overdosing on fentanyl pills, the mention of which the Defense

14  contends would be unduly prejudicial to Defendant. (Doc. 554 at 2.) Because the copy of the

15  press release attached to the Government's motion is redacted and does not mention any

16  overdose, the Court presumes the redacted version will be offered. Thus, Defendant's concern is

17  moot. This motion is **GRANTED**.

18          b.  *Driver's License*

19      The Government moves for pretrial admission under Fed. R. Evid. 803(8) and 902(1), of

20  Defendant's California driver's license, which will be presented by way of a certified copy of that

21  record. (Doc. 542 at 24–25.) The Defense does not object. This motion is **GRANTED**.

22      **3.**    **Other Undisputed Government Motions**

23      Citing well established law, the Government moves to (a) preclude Defendant from

24  admitting evidence or raising arguments only relevant to jury nullification; (b) exclude evidence

25  and argument regarding punishment, (c) and preclude Defendant from raising a duress defense.

26  (Doc. 542 at 32–34.) The Defense does not oppose any of these motions, which are **GRANTED**.

27      **4.**    **Government's Motion for Reciprocal Discovery**

28      The Government moves for reciprocal discovery, indicating that the Defense has not

provided any. (Doc. 542.) The Defense claims to have complied with reciprocal discovery

requirements in her Motion in Limine #6, (Doc. 554 at 3), to which are attached several wiretap

transcripts. (*See* Doc. 539-1.) The Defense explained at the hearing that the only discovery that

may be produced is a report prepared by an investigator after speaking with Defendant's brother.

The Defense agrees to produce this report at the start of trial.

**D.      Other Defense Motions in Limine**

    **1.      Defendant's Motion in Limine #5 to Preclude Reference to "Operation Killer High"**

Defendant moves under Federal Rule of Evidence 403 to preclude at trial any reference to

the name of the investigation "Operation Killer High" or reference to any overdose that led to this

investigation. (Doc. 534.) Defendant specifically directs the Court's attention to related

statements made by officers during his interview at page GARZA 2633. (*Id*.)

The government does not oppose this motion and proposed specific redactions to the

audio recording and transcript of Defendant's interview. (*See* Doc. 572.)  Accordingly, the motion

is **DENIED AS MOOT.**

**E.      Rule 404(b) Notice**

The Government gave notice pursuant to Rule 404(b) that it intends to introduce the

following evidence of other acts of the defendant in its case in chief and/or rebuttal case. (Doc.

542 at 35.)

Rule 404(a) provides "[e]vidence of a person's character or character trait is not

admissible to prove that on a particular occasion the person acted in accordance with the character

or trait." Fed. R. Evid. 404(a). Rule 404(b) provides that "[e]vidence of a crime, wrong, or other

act is not admissible to prove a person's character in order to show that on a particular occasion

the person acted in accordance with the character." Fed. R. Evid. 404(b). Rule 404(b) provides,

however, that prior acts evidence "may be admissible for another purpose, such as proving

motive, opportunity, intent, preparation, plan, knowledge, identity, absence of mistake, or lack of

accident." Fed. R. Evid. 404(b).

The Ninth Circuit has held that "Rule 404(b) is a rule of inclusion." *United States v.*

*Alfonso*, 759 F.2d 728, 739 (9th Cir. 1985). "Thus, evidence of past wrongful acts is admissible if it is relevant to an issue other than the defendant's character or criminal propensity." *Id*. Evidence of other acts that explain the nature of the relationship between the defendant and a witness and/or put their interactions into context is admissible under Rule 404(b). *See United States v. McKoy*, 771 F.2d 1207, 1214 (9th Cir. 1985). Once relevance is established, the district court should admit the evidence unless its prejudicial impact substantially outweighs its probative value. *Id*.

### 1.    Evidence of Garza asking JR for Cocaine

On December 25, 2021, Garza texted JR, "I need some lmaooo" to which JR replied, "Some what." The defendant responded, "coke lmao" and JR encouraged her to "get some." The defendant then asked, "ur my only connect lol, but can u do me a favor."

The Defense objects to this evidence on relevance grounds. (Doc. 554.) The Government contends this evidence establishes Garza's knowledge that JR trafficked in narcotics, including cocaine, and that he was her only source of cocaine. (Doc. 542 at 37.) In addition, her statement "can you do me a favor" tends to prove her intent, plan, and modus operandi to commit acts in furtherance of a drug trafficking conspiracy in return for user amounts of cocaine as payment. (*Id*.) According to the Government, this is consistent with other evidence indicating that Garza and her co-conspirators referred to acts they committed in furtherance of the conspiracy as "favors" or "errands." █████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████

Because the government proffers a reason to admit this evidence other than to demonstrate her character, and the probative value of the evidence far outweighs any unfair prejudice, the evidence may be admitted with a limiting instruction.

### 2.    Evidence of Garza Accompanying JR to Pick Up Narcotics

On February 9, 2022, JR and Defendant traveled from Fresno to Sanger in two separate cars. It is alleged that the purpose of this trip was to deliver narcotics to Abel Lozano. JR drove with the narcotics in his car, while Garza drove in a separate car. The Government plans to offer

expert testimony that will explain how this is a common tactic used to evade law enforcement detection. (Doc. 542 at 37.) For example, if law enforcement were to attempt a traffic stop on the car with narcotics, the second car would intentionally commit traffic violations to attract law enforcement attention away from the car containing narcotics. (*Id*.)

Defendant objects to the assertion that she accompanied JR to pick up narcotics, because JR did not tell her what was in the bag, and she did not ask or otherwise investigate. (Doc. 554 at 4.) There is also no evidence that the bag in question contained narcotics. (*Id*.) Therefore, Defendant maintains this speculative evidence is more prejudicial than probative under Rule 403.

The Government contends that, even though there is no evidence that Garza looked into the bag, Garza's participation in this trip demonstrates something other than her character, such as her preparation and absence of mistake related to her later participation in the trip to Sanger. Because the government proffers a reason to admit this evidence other than to demonstrate her character, and the probative value of the evidence far outweighs any unfair prejudice, the evidence may be admitted with a limiting instruction.

### 3. Garza wires money to Mexico

The Government plans to offer evidence of 13 wire transfers ranging from $100.01 to $1,000.00, sent by Garza between February 26, 2020 and January 24, 2022 to locations in Mexico. (Doc. 542 at 35.) According to the Government, these were "made outside of the charged conspiracy," but expert testimony will indicate that these wires followed a pattern commonly used by drug traffickers and that drug traffickers commonly utilize other individuals to wire the drug proceeds on their behalf to evade law enforcement detection. (*Id*. at 38.) The Government

1   contends that these other acts are probative of Garza's knowledge, intent, plan, and modus

2   operandi, but are not provocative or inflammatory because they are "not nearly as serious as the

3   charged conduct" and because any prejudice can be further reduced by a limiting instruction. (*Id*.)

4   Defendant objects to the admission of these wire transfers as "misleading" because the

5   Government has omitted numerous transfers during this same timeframe for sums between $200-

6   $500. (Doc. 554 at 4.) Yet, Defendant has not presented those other wire transfers for the Court's

7   consideration. Defendant also contends the Government's wire transfers will prove "more

8   prejudicial than probative" but fails to explain why. (*Id*.)

9   It appears that this evidence is admissible under 404(b), if relevant. Assuming there is

10   expert evidence demonstrating how these wire transfers relate to drug trafficking, it appears the

11   wires would be probative and any prejudice, above that which normally attaches to relevant

12   evidence, would not outweigh the probative value. The fact that Defendant believes there are

13   innocent explanations for these wire transfers, this goes to the weight of the evidence, not the

14   admissibility.

15   **F.    <u>Other Matters</u>**

16   **1.    Motion to Compel based on *Touhy* Requests (Doc. 545)**

17   Defendant moves the Court for an order requiring the Government to produce certain

18   government employees as witnesses at trial. Defendant represents she has made a request for

19   these witnesses pursuant to *United States ex rel. Touhy v. Ragen*, 340 U.S. 462 (1951). (Doc.

20   545.) Specifically, Defendant has requested HSI Agents Jackie Lovato and Sean Essex who

21   surveilled Ms. Garza on February 9, 2022 and HSI Agents Bret Koch and Robert Benesiewicz

22   who interviewed Ms. Garza on March 31, 2022. (*Id*.) The Government has indicated that it will

23   produce the requested witnesses.

24   **2.    Request for Judicial Notice**

25   Defendant requests that the Court take judicial notice of the DEA Drug Fact Sheet for

26   Counterfeit Pills, which is readily available on the DEA website. (*See* Doc. 535, 535-1.) The fact

27   sheet covers counterfeit oxycodone M30s, counterfeit Adderall tablets, and counterfeit Xanax

28   tablets. (Doc. 535-1.) For each substance addressed, the fact sheet describes their origin, common

street names, appearance, how they are used, the effect on the human body, effects of overdose, and their legal status in the United States. (*Id.*)

The Government objects that "[m]uch of the fact sheet is irrelevant and contains legislative facts which are not properly the subject of judicial notice. Taking judicial notice as Garza requests would also serve to confuse the issues, mislead the jury, and waste time." (Doc. 567. The Government requests that the Court "either order Garza to identify each specific fact she seeks to be judicially noticed, and allow the government a chance to respond, or deny defendant's motion in whole." (Doc. 567.)

Defendant indicates that she simply wishes for the Court to take judicial notice that the Fact Sheet was published by the DEA in 2021. (Doc. 591.) She intends to use the Fact Sheet to cross examine Agent Riley, who may testify that M-30 pills were typically fentanyl pills in 2021. (*Id.*) Defendant maintains she is entitled to cross examine him with official DEA publications stating otherwise and the Fact Sheet indicates M-30s may contain no controlled substance, a different controlled substance, or a different amount of a controlled substance. (*Id.*)

It is well established that the Court may take judicial notice of the existence, but consideration of the record does not extend to the truth of the matters asserted within that record. *United States v. S. Cal. Edison Co.*, 300 F. Supp. 2d 964, 974 (E.D. Cal. 2004) To the extent the Defense simply wants to present the public record to Agent Riley as a DEA publication, the request is **GRANTED**, but this alone, does not permit the presentation of the contents of the document to the jury. As to the contents of the request, the request is **DENIED without PREJUDICE**.

### 3.        Defendant's Reservation of Right to Move to Suppress (Doc. 536)

Defendant moved to suppress the results of the search of the package mailed by her in January 2022. (Doc. 177.) That motion was denied on September 6, 2022 (Doc. 220), as was the Defendant's motion for reconsideration of that order. (*See* Doc. 502.) On August 30, 2024, the Defense filed a "notice" that should the ruling on the motion to suppress be reversed on appeal, she would also move to suppress her custodial interview and the search of her phone as the fruit of the poisonous tree. (Doc. 536.) The Court agrees with the Government, (*see* Doc. 575 (also

reserving right to oppose any fruit of the poisonous tree arguments)), that there is no reason for the Court to take any action with respect to this notice.

IT IS SO ORDERED.

Dated:   **September 17, 2024**

UNITED STATES DISTRICT JUDGE